STATE OF NEW JERSEY, PLAINTIFF-APPELLANT, v. EDWARD BARRY, DEFENDANT-RESPONDENT.

Argued October 7, 1980—Decided May 21, 1981.

*Hilary L. Brunell*, Assistant Essex County Prosecutor, argued the cause for appellant (*John J. Degnan*, Attorney General of New Jersey, attorney; *Donald S. Coburn*, Essex County Prosecutor, of counsel).

*Randall W. Westreich*, Designated Counsel, argued the cause for respondent (*Stanley C. Van Ness*, Public Defender, attorney).

The opinion of the Court was delivered by

SULLIVAN, J.

Defendant Edward Barry was convicted of felony murder and conspiracy. He was sentenced to life imprisonment for the felony murder and a consecutive term of two to three years for the conspiracy. On appeal, the Appellate Division, in an opinion reported at 171 *N.J.Super.* 543 (1979), reversed the judgment of conviction and ordered a new trial on the ground that defendant's confession, introduced into evidence at his trial, should have been excluded as the fruit of an illegal arrest. The Appellate Division also held that defendant should have been allowed to introduce into evidence the confessions of co-conspirators Mark Jackson and Walter Barry (defendant's brother) which did not implicate defendant as a participant in the criminal episode.[1] The Appellate Division said that the confessions were statements against the penal interests of the declarants and admissible under *Evid.R.* 63(10). The State's petition for certification was granted. 84 *N.J.* 388 (1980). We now reverse and reinstate the judgment of conviction.

The State's proofs at trial showed the following. On January 12, 1976, defendant Edward Barry, his brother Walter Barry, Archie Murphy and Mark Jackson planned the robbery of the First Federal Savings and Loan Association of Montclair. They first met at an apartment in East Orange. Murphy supplied the guns to be used in the robbery but did not go to the bank. Defendant drove the getaway car to and from the bank. His brother Walter Barry, armed with a sawed-off shotgun, stood outside the bank as a backup man. Mark Jackson, armed with a revolver, entered the bank and committed the actual robbery which netted approximately $1,700. Included in these robbery

---

[1] Jackson had pleaded guilty. Walter Barry had been tried separately and convicted.

proceeds was a package of "bait money." [2]  During the course of the robbery, Jackson shot and killed Sergeant Alfred Sellick of the Montclair Police Department who was on special assignment at the bank.  Defendant then drove his brother and Jackson back to the apartment where Murphy was waiting and the money was divided.

The next morning an anonymous phone call tip was received at Montclair Police Headquarters describing the automobile used in the robbery.  On the following day, Walter Barry was apprehended while operating the car in question and brought to headquarters for questioning.  In the meantime the police, possessing information concerning a suspect in another bank robbery, and having viewed a concealed bank camera videotape of the First Federal robbery, obtained a warrant for the arrest of Mark Jackson.  He was arrested on the morning of January 15, 1976 in Newark and taken in for questioning.  He later gave a statement implicating himself, Walter Barry and Archie Murphy in the First Federal holdup.

Based on this statement, a warrant for the arrest of Archie Murphy was issued.  In the meantime, the police had also obtained a statement from Walter Barry that he and Jackson alone were involved in the First Federal robbery.  On January 15, 1976, at about 7:00 p. m., the police went to an East Orange apartment building to execute the arrest warrant for Murphy. When they arrived at the building, one of the detectives saw defendant Edward Barry standing outside and recognized him from a prior investigation of another robbery.  Defendant was placed under arrest and given *Miranda* warnings.  The officers then entered the building, found Murphy in one of the apartments and arrested him.  Money which Murphy tried to hide in a sofa as the officers entered the room was confiscated, together with additional currency found in Murphy's pocket.

[2]"Bait money" is a special collection of bills, not used in normal banking transactions, for which the bank maintains a record of serial numbers to facilitate the subsequent apprehension of robbery suspects.

Defendant and Murphy were initially taken to the East Orange police station and then transported to the Montclair Police Headquarters. Since the Montclair facilities were overcrowded, defendant was transferred to the jail in the neighboring town of Glen Ridge and lodged there overnight.

After Murphy's arrival in Montclair, a comparison of the serial numbers of the bills found in Murphy's possession at the time of his arrest with the bank's record of the "bait money" resulted in the positive identification of one of the bills. Shortly thereafter, at approximately 1:25 a. m. on January 16, 1976, Murphy gave the police a statement implicating himself, Jackson, Walter Barry and defendant in the robbery. At the time of Murphy's statement, defendant was still lodged in the Glen Ridge jail as a result of his arrest some six hours earlier. On the basis of the Murphy statement, defendant was returned to Montclair Police Headquarters for a court appearance scheduled for 1:00 p. m. later that day in which he was to be formally charged with homicide.

Upon his return to Montclair Police Headquarters, defendant was given *Miranda* warnings once again and signed a written acknowledgment of their receipt. He was then questioned for the first time and told that Jackson, Murphy and his brother had all confessed to the robbery and that he had been implicated. Defendant was shown these confessions and reviewed their contents with Captain Charles Cummings, Detective Captain of the Montclair Police Department. He was also shown the weapons used in the robbery, as well as the deceased officer's gun, which had all been previously recovered by the police. At this point defendant agreed to confess and proceeded to give a full written statement of his involvement in the criminal episode.

The statement admitted defendant's participation in the planning and commission of the robbery. He identified Archie Murphy, Walter Barry, Mark Jackson and himself as the participants. Defendant stated that while Murphy remained at the

apartment, he drove the car to and from the scene of the robbery with Walter Barry and Mark Jackson as passengers. Upon their return to the apartment after the robbery, the proceeds of approximately $1,700 were divided. After completing and signing his statement, defendant was brought into court and charged. Subsequently, defendant, Walter Barry and Archie Murphy were jointly indicted for murder, armed robbery and conspiracy. A separate indictment was returned against Jackson.

Defendant received a separate trial by jury and was convicted. His written statement constituted the principal evidence against him. He did not testify at trial but sought to introduce into evidence the confessions of Mark Jackson and Walter Barry which tended to exculpate him, to the extent that neither of these statements named him as a participant in the criminal episode. The Walter Barry confession stated that he (Walter Barry) had driven the car to and from the bank and that Mark Jackson was the only other person with him in the car. Jackson's confession stated that Walter Barry drove the car and that "just me and him" were in it when they drove to the bank and, after committing the robbery, returned to the apartment. Jackson's statement also implicated Archie Murphy in the planning of the crime. The trial court excluded these two confessions, holding that a statement was admissible under *Evid.R.* 63(10) only when the declarant was unavailable to testify. The court also noted that defendant was implicated by the Murphy confession, which was concededly nonadmissible, and stated that it would be prejudicial to the State to allow only the Walter Barry and Mark Jackson confessions into evidence. After his conviction, defendant was sentenced to life imprisonment for the felony murder and a consecutive term of two to three years for conspiracy.

As heretofore noted, the Appellate Division reversed the conviction, holding that defendant's statement should have been excluded as the fruit of an illegal arrest and that the statements of co-conspirators Walter Barry and Mark Jackson were admissi-

ble under *Evid.R.* 63(10). The Appellate Division found all of defendant's other contentions of error were clearly without merit. It did not pass upon the claim of excessive sentence, however, in view of the remand for a new trial.

We consider first the admissibility of defendant's confession. The Appellate Division held that it was the fruit of an illegal arrest and, therefore, excluded it. 171 *N.J.Super.* at 547–548. We disagree. The appropriate test to be applied in this type of case is whether the confession falls on one side or the other of the line that separates confessions which resulted from an exploitation of an illegal arrest from those which were the product of the defendant's free will, the taint of the illegal arrest having been sufficiently attenuated. See *Brown v. Illinois,* 422 *U.S.* 590, 95 *S.Ct.* 2254, 45 *L.Ed.*2d 416 (1975); *Dunaway v. New York,* 442 *U.S.* 200, 99 *S.Ct.* 2248, 60 *L.Ed.*2d 824 (1979); *Rawlings v. Kentucky,* 448 *U.S.* 98, 100 *S.Ct.* 2556, 65 *L.Ed.*2d 633 (1980); Note, "The Fourth Amendment and Tainted Confessions: Admissibility as a Policy Decision," 13 *Houston L.Rev.* 753, 771 (1976).

■ · The inquiry for determining whether a defendant's statements are tainted by antecedent illegality is not a factual one, neither of foreseeability on the part of the police, nor of causal connection (the "but for" test having been rejected) but rather is a question of judgment. Considering the purposes of the exclusionary rule in these matters (deterrence of illegal arrests and preservation of the integrity of the judiciary) and the competing purpose of discovering the truth in a criminal trial, the court is required to make a value judgment by considering three factors as they relate to those purposes: the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct. *Brown v. Illinois,* 422 *U.S.* at 603–604, 95 *S.Ct.* at 2261–2262, 45 *L.Ed.*2d at 427.

The United States Supreme Court recently considered the application of these touchstone factors in *Dunaway v. New*

*York, supra.* In *Dunaway* a homicide had been committed during the attempted robbery of a store. An informant told the police that Dunaway was involved in the crime but the information given was insufficient to allow the police to obtain a warrant for Dunaway's arrest. Nevertheless, the police took Dunaway into custody and questioned him after giving him *Miranda* warnings. While still in custody, he eventually gave statements and drew sketches implicating himself in the crime. This evidence was used at trial and resulted in his conviction for attempted robbery and felony murder.

The United States Supreme Court reversed the conviction. It held that Dunaway's constitutional rights had been violated when the police, without probable cause to arrest, took defendant into custody and brought him to the police station for questioning. The Court held that the detention for custodial interrogation intruded so severely on interests protected by the Fourth Amendment as to trigger the traditional safeguards against illegal arrest. 442 *U.S.* at 216, 99 *S.Ct.* at 2258, 60 *L.Ed.* 2d at 838. After taking into account factors such as the temporal proximity of the illegal arrest and confession, the presence of intervening circumstances and the purpose and flagrancy of official misconduct, the Supreme Court concluded that there was no intervening event which broke the connection between the illegal detention and the incriminatory statements. The giving of *Miranda* warnings, even though sufficient for Fifth Amendment purposes, was held not to render the connection sufficiently attenuated under Fourth Amendment analysis to permit use of Dunaway's statements at trial. 442 *U.S.* at 219, 99 *S.Ct.* at 2259, 60 *L.Ed.*2d at 840.

We conclude that application of the appropriate Supreme Court test in the instant case does not call for the exclusion of Edward Barry's statement as the fruit of an illegal arrest. Although defendant's initial detention at about 7:00 p. m. on January 15 was illegal, because the police at that time were without probable cause to arrest, there is no indication that the police attempted to question him then. Some six hours later,

however, Archie Murphy, who was arrested with defendant, gave the police a full statement concerning the robbery and implicated defendant as a principal participant. At that point, the police had probable cause to hold defendant as a suspect in the murder investigation. Indeed, it was decided to bring defendant before the court to be charged with homicide along with his three co-conspirators that same day. He was then returned to Montclair Police Headquarters for that purpose. While there, and after having been given *Miranda* warnings again, he was told that his three co-conspirators had confessed and the contents of those statements were reviewed with him. He was also shown the weapons used in the robbery, as well as the deceased officer's gun, which had been recovered by the police. It was only after these events that defendant gave a full statement of his involvement in the robbery-murder.

We hold that these intervening independent circumstances which preceded defendant's confession effectively purged the taint of his illegal arrest. Statements following an illegal arrest must be excluded from evidence only if they are causally related to the invasion of the suspect's rights. The instant facts do not present the close causal connection between the illegal seizure and the confession found in *Dunaway.* 442 *U.S.* at 218–219, 99 *S.Ct.* at 2259–2260, 60 *L.Ed.2d* at 839–840 (1979). The occurrence of other independent causative events including Murphy's confession, which directly implicated defendant, and recovery of the guns, which were shown to defendant, severed any possible chain of causation between the original illegal arrest and defendant's subsequent confession.[3]

---

[3]It should also be noted that defendant was questioned for the first time and his statement taken only after he was being legally held as a prime suspect in the robbery-murder on the basis of the Murphy confession.

While we need not, and do not, base our decision today on that fact, the Second Circuit has strongly indicated that confessions are admissible, despite the prior illegal arrest, if given at a time when probable cause in fact existed. *United States v. Morris,* 451 *F.Supp.* 361 (E.D.N.Y.1978), *vacated*

There is no suggestion in the instant case that the police were making an investigatory arrest. The facts, while short of establishing probable cause for the initial arrest of Edward Barry, provide the basis for an innocent although unreasonable belief in its existence (defendant, suspected of being involved in a similar prior robbery, having been questioned about same, being the brother of a clearly implicated prime suspect, and found standing in front of the building where another prime suspect was at that moment residing). Furthermore, the subsequent behavior of the police reinforces the lack of investigatory purposefulness in this illegal arrest. Defendant, as heretofore noted, was not questioned until immediately prior to the scheduled arraignment before a magistrate. In addition, he was once again given full *Miranda* warnings only moments before the questioning. The United States Supreme Court has recently suggested that such *Miranda* warnings, although obviously not sufficient standing alone to attenuate the taint of an illegal arrest, are nevertheless an important consideration in determining whether a confession was "obtained by exploitation of an illegal detention." *Rawlings v. Kentucky*, 448 *U.S.* at 106–107, 100 *S.Ct.* at 2562–2563, 65 *L.Ed.*2d at 643.

We therefore hold that under the facts of this case the State has met its burden of establishing that the confession was the product of the defendant's free will, rather than the result of the exploitation of an illegal arrest. Considering the purpose and circumstances of the arrest, the lack of temporal proximity between the arrest and defendant's subsequent statement, and the occurrence of other independent causative events, we are satisfied that defendant's confession was properly admitted at trial.

■ Defendant's further contention, raised for the first time before the Appellate Division, that his confession should be

---

*and remanded,* 597 *F.*2d 341 (2d Cir. 1979). See also *People v. Calhoun*, 78 *A.D.*2d 658, 432 *N.Y.S.*2d 226 (App.Div.1980).

suppressed because he was not taken before a committing magistrate without unnecessary delay following his arrest (see *R.* 3:4–1) has no merit. Delay is a factor in determining the voluntariness of a confession but does not of itself render an otherwise voluntary confession inadmissible. *State v. Seefeldt,* 51 *N.J.* 472, 486 (1968). The trial court, following a hearing on the issue, found defendant's statement was made voluntarily and was therefore admissible in evidence. The record fully supports this determination.

The second question presented is whether defendant should have been allowed to introduce into evidence the confessions of Walter Barry and Mark Jackson. As heretofore noted, these confessions tended to exculpate defendant since they identified Walter Barry as the driver of the car and also indicated that no one else was in the vehicle except Jackson when they drove to the bank and returned to the apartment after the robbery.

■ Preliminarily, it is clear that the trial court was in error in ruling that a statement against interest is not admissible under *Evid.R.* 63(10) unless the declarant is unavailable as a witness. The rule is not so limited in its application. *State v. Abrams,* 140 *N.J.Super.* 232, 237 (App.Div.1976), aff'd o. b., 72 *N.J.* 342 (1977). This does not end the inquiry, however, as the State argues that the exclusion was correct albeit for reasons other than those expressed by the trial court.

The Appellate Division, in holding that defendant should have been allowed to introduce these confessions into evidence, relied on *State v. Abrams, supra. Abrams* involved a joint trial of Barry Abrams and a co-defendant Chenille Smith on a charge of possession and distribution of cocaine. The State's main witness was an undercover detective who testified that he had purchased cocaine from Smith and had seen her purchase it from Abrams. Smith had confessed that, "I, Chenille Smith, sold Ernest [the detective] a bag of cocaine, but I didn't and never got nothing from [Abrams]." 140 *N.J.Super.* at 235.

The trial judge allowed the Smith confession to be put in evidence against that defendant but excised therefrom the part which said "but I didn't and never got nothing from [Abrams]" as not within the hearsay exception. Both defendants were convicted. Abrams appealed on the ground that the entire confession, including the part favorable to him, should have been put in evidence. The Appellate Division agreed and reversed Abrams' conviction, holding that the exculpatory part of the statement as to Abrams, in the context of the whole statement, intensified the personal criminal responsibility of the declarant and therefore was admissible under *Evid.R.* 63(10). Any argument that the declarant had nothing to lose and was solely attempting to shield his compatriots was to be presented to the jury, as such an interpretation goes to the weight of the evidence rather than its admissibility. We affirmed substantially for the reasons given by the Appellate Division. 72 *N.J.* at 342.

■ In the present case, the State argues that those portions of the statements of Walter Barry and Mark Jackson which tend to exculpate defendant are clearly separable from the inculpatory parts and not in any sense against the penal interests of the declarants. The State believes that the exculpatory statements were nothing more than a deliberate attempt to shield the other confederates and not integral parts of the confessions.[4] Arguably, under the standard established in *State v. Abrams* and summarized above, the statements should have been admitted. We need not, however, evaluate the merits of the State's position, beyond what has been said in *State v. Abrams*, because even were we to conclude that the statements should have been admitted into evidence, we would nevertheless uphold the conviction on the ground of harmless error.

---

[4]As previously noted, Walter Barry had been tried separately and convicted. Jackson had pleaded guilty. Defendant made no effort to call these persons as witnesses.

The record shows that defense counsel, in his cross-examination of Captain Cummings, elicited in considerable detail the fact that both Walter Barry and Mark Jackson, in confessing to their involvement in the criminal episode, had said that Walter Barry drove the automobile to and from the scene of the bank robbery and no one else was with them at the time. Although the trial court sustained the prosecutor's belated objection that defense counsel was "attempting to use the statement of a co-defendant to prove the truthfulness of something they said," no limiting instruction was given to the jury. Indeed, on more than one occasion defense counsel in his summation to the jury posed the issue to be decided as whether Walter Barry, and not the defendant, was the one operating the car on the night of the robbery. While the statements themselves were not allowed into evidence, the exculpatory parts thereof were fully revealed to the jury and the error, if any, was harmless.

█ We agree with the Appellate Division's disposition of the other issues raised by defendant and have also considered the claim of excessive sentence. The life sentence for felony murder was mandatory. Adding on an additional two to three years for the conspiracy in the light of this planned criminal episode was not excessive or unduly punitive. The judgment of the Appellate Division is reversed and the judgment of conviction, including sentence, reinstated.

PASHMAN, J., dissenting.

Defendant's statement was the only evidence admitted at the trial connecting him to the crimes of which he was convicted. As the State concedes before this Court, defendant was arrested without probable cause in violation of his Fourth Amendment rights. Defendant was then illegally detained for eighteen hours, without seeing anyone except law enforcement officers. Before his arraignment, he was told by the police that several participants in the crime had made statements implicating him. He then gave an inculpatory statement. The majority holds that the occurrence of other causative events including Murphy's

confession, which directly implicated defendant, and the recovery of the guns, which were shown to defendant, "severed any possible chain of causation between the original illegal arrest and defendant's subsequent confession." *Ante* at 89. Because I do not find these intervening events any more significant than the ones in *Brown v. Illinois*, 422 *U.S.* 590, 95 *S.Ct.* 2254, 45 *L.Ed.*2d 416 (1975), where the Supreme Court suppressed the defendant's confession, and because I believe that suppression of defendant's statement is necessary to deter similar police conduct, I dissent.

## I

The primary purpose of the exclusionary rule is to deter violations of the Fourth Amendment. The rule "compel[s] respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." *Elkins v. United States*, 364 *U.S.* 206, 217, 80 *S.Ct.* 1437, 1444, 4 *L.Ed.*2d 1669 (1960). In determining when it is necessary to exclude an incriminating statement obtained after an unreasonable search or seizure, the Supreme Court has focused on the question whether "the connection between the lawless conduct of the police and the discovery of the challenged evidence has 'become so attenuated as to dissipate the taint.'" *Wong Sun v. United States*, 371 *U.S.* 471, 487, 83 *S.Ct.* 407, 417, 9 *L.Ed.*2d 441 (1963). By focusing on "the causal connection between the illegality and the confession," *Brown v. Illinois*, 422 *U.S.* 590, 603, 95 *S.Ct.* 2254, 2261, 45 *L.Ed.*2d 416 (1975), the attenuation doctrine serves to indicate when exclusion is necessary to further the purpose of deterrence. *See Dunaway v. New York*, 442 *U.S.* 200, 217–18, 99 *S.Ct.* 2248, 2258–59, 60 *L.Ed.*2d 824 (1979). When there is a close causal connection between an illegal arrest and a confession, it is likely that the police could have foreseen that the statement would be a product of their illegal conduct and, therefore, that the desire to obtain a confession might have been a motivating factor behind the initial arrest. In such

cases, exclusion of the confession is the best way to deter similar misconduct in the future.

The parallels between the circumstances in *Brown v. Illinois, supra,* and this case are striking. Brown was arrested without probable cause as a suspect in a murder investigation. At the station house, following a period of unbroken detention, the police brought out their file on the investigation and confronted Brown with the information they had obtained. After notifying Brown of his *Miranda* rights, the officers told him that they knew of an incident in which he had fired a shot from a revolver into the ceiling of a poolroom. They then informed him that a bullet extracted from the ceiling had been taken to the laboratory for comparison with the bullets taken from the murder victim. Brown then agreed to give a statement. 422 *U.S.* at 594, 95 *S.Ct.* at 2257.

In *Brown* the Supreme Court identified three factors to be considered in determining whether exclusion of a confession obtained during an illegal detention is necessary. These are the "temporal proximity of the arrest and the confession, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct." *Id.* at 603–04, 95 *S.Ct.* 2261–62 (citation and footnotes omitted). The Court stated that the burden of showing admissibility rests on the prosecution. *Id.* at 604, 95 *S.Ct.* at 2262.

Applying its three-part test to the facts of the case, the Supreme Court concluded that the State had not met its burden of showing that Brown's statement was admissible. The "statement was separated from his illegal arrest by less than two hours, and there was no intervening event of significance whatsoever." *Id.* The Court reached this conclusion even though Brown had confessed only after learning of the evidence against him. The Court also found that the illegality of the arrest had "a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their

testimony, that the purpose of their action was 'for investigation' or for 'questioning.'" *Id.* at 605, 95 *S.Ct.* at 2262.

The Supreme Court's reasoning and holding in *Brown*, completely ignored by the majority, require suppression of Barry's statement in this case. First, although Barry made his statement after eighteen hours of detention instead of two, the difference is not significant because it was a period of unbroken custody. Indeed, one case cited in *Brown* to illustrate the relevance of the time between an arrest and a statement, 422 *U.S.* at 603 n.8, 95 *S.Ct.* at 2262 n.8, ordered the suppression of a statement made forty-two hours after the illegal arrest. *See Hale v. Henderson*, 485 *F.*2d 266, 267–69 (6th Cir. 1973), *cert.* denied, 415 *U.S.* 930, 94 *S.Ct.* 1442, 39 *L.Ed.*2d 489 (1974). The events occurring during the detention, not the mere passage of time, are the significant factors in determining whether exclusion is necessary because the illegal arrest has not been attenuated. *See* 3 W. LaFave, *Search and Seizure* § 11.4 at 633–34 (1978); Comment, *The Fourth Amendment and Tainted Confessions: Admissibility as a Policy Decision*, 13 *Hous.L.Rev.* 753, 764–66 (1976). As Justice Stevens has said, "[i]f there are no relevant intervening circumstances, a prolonged detention may well be a more serious exploitation of an illegal arrest than a short one." *Dunaway v. New York, supra*, 442 *U.S.* at 220, 99 *S.Ct.* at 2260 (concurring opinion). Since the mere passage of time after an illegal arrest is by itself not determinative, the other two factors—the presence of intervening circumstances and the purpose and flagrancy of the police conduct—are the crucial issues in the inquiry.

The majority holds that the disclosure of Archie Murphy's confession and the display of weapons used in the crime to the defendant constituted an intervening event breaking the causal chain between the illegal arrest and defendant's confession. *Ante* at 89. I fail to see the relevance of this event to the attenuation doctrine, the purpose of which is to determine whether exclusion of a challenged piece of evidence will serve as a deterrent to similar police misconduct. Although the Supreme

Court has not defined "intervening circumstances," the examples contained in the Court's opinions indicate that the event must create a demonstrable break between the illegal arrest and the confession, such as through actual release from detention, *see Wong Sun v. United States, supra*, 371 *U.S.* at 491, 83 *S.Ct.* at 419; appearance before a neutral magistrate, *see Johnson v. Louisiana*, 406 *U.S.* 356, 365, 92 *S.Ct.* 1620, 1626, 32 *L.Ed.*2d 152 (1972), cited in *Brown v. Illinois, supra*, 422 *U.S.* at 604, 95 *S.Ct.* at 2262; or consultation with counsel, *see Brown v. Illinois, supra*, 422 *U.S.* at 611, 95 *S.Ct.* at 2265 (Powell, J., concurring); *Pennsylvania ex rel. Craig v. Maroney*, 348 *F.*2d 22, 30 (3d Cir. 1965), cited in *Brown v. Illinois, supra*, 422 *U.S.* at 603 n.8, 95 *S.Ct.* at 2262 n.8. Nowhere does the Court suggest that mere confrontation with evidence of guilt during interrogation is sufficient to attenuate the taint of an illegal arrest. The holding in *Brown* is strong evidence to the contrary. As in this case, the defendant in *Brown* was confronted with the evidence that the police had against him immediately before he gave a statement. Unlike the majority in this case, however, the Supreme Court held that "there was no intervening event of significance whatsoever." 422 *U.S.* at 604, 95 *S.Ct.* at 2262. Furthermore, as the majority itself recognizes, *ante* at 87, the factors in *Brown* must be evaluated in light of the purposes of the exclusionary rule. This is the very kind of case where suppression is most necessary for deterrence. If the facts of this case present sufficient intervening circumstances, then police will have little incentive to refrain from illegally arresting someone upon mere suspicion and detaining him in hope that the investigation will uncover evidence of guilt with which to confront the suspect and perhaps obtain a confession.

The conclusion that suppression is necessary here is supported by the third factor in *Brown* : the purpose and flagrancy of the police conduct. Although the manner in which defendant was arrested was not so flagrantly abusive of personal liberty and privacy as the arrest in *Brown*, the Supreme Court's decision in

*Dunaway v. New York, supra,* establishes that police conduct need not be threatening and frightening before suppression is justified. Rather, the purpose of the violation is the significant factor. *Id.,* 442 *U.S.* at 218, 99 *S.Ct.* at 2259. Here, as in *Dunaway* and *Brown,* defendant was arrested without the slightest trace of probable cause "in the hope that something might turn up." *Id.* The need to curb the kind of illegal arrest that occurred in this case is not diminished, as the majority implies, *ante* at 90, by the arresting officer's alleged "innocent although unreasonable belief" in the existence of probable cause. Nor is it significant that Barry's arrest was not "investigatory"; the Fourth Amendment was not adopted solely to prevent investigatory arrests. The Supreme Court has repeatedly stated that "[h]ostility to seizures based on mere suspicion was a prime motivation for the adoption of the Fourth Amendment, and decisions immediately after its adoption affirmed that 'common rumor or report, suspicion, or even "strong reason to suspect" was not adequate to support a warrant for arrest.' " *Id.* at 213, 99 *S.Ct.* at 2256. Because the kind of misconduct that occurred in this case poses so great a threat to individual liberty, there is a commensurate need for an effective deterrent to remove the motivation for such illegal conduct. Exclusion of evidence that the police will foreseeably obtain by exploiting an illegal arrest is the only effective sanction available. Defendant's confession is that kind of evidence.

At various points in its opinion, the majority observes that because of Archie Murphy's incriminating statement, the police had probable cause to hold defendant by the time they took his confession. *Ante* at 89 & 90. The majority wisely declines to hold that defendant's statement is admissible for this reason, *ante* at 89 & 90, although its apparent approval of the questionable decisions cited is troubling. "It is axiomatic that hindsight may not be employed in determining whether a prior arrest or search was made upon probable cause." 1 W. LaFave, *supra,* § 3.2(d)

at 465–66. Once the illegality of an arrest is shown, the question becomes whether the challenged evidence was obtained by exploiting that arrest and whether exclusion is a necessary sanction. The discovery of additional evidence to support probable cause during the illegal detention in no way breaks the causal chain connecting a statement with the prior illegal arrest. Nor does it eliminate the effectiveness of exclusion as a deterrent. When the police arrest someone based on mere suspicion, they presumably envisage the subsequent discovery of evidence of guilt. Before the police may interrogate an illegally arrested suspect with assurance that any statement he makes will be admissible, they must make an effective break with the prior arrest, for example, by giving him the opportunity to confer with counsel or by presenting him to a magistrate for arraignment or a probable cause determination.

## II

To summarize, *Brown v. Illinois* requires the suppression of defendant's confession as the fruits of an illegal arrest. Such suppression is necessary to deter future arrests based on nothing more than suspicion. Because I believe that this important principle of law requires the reversal of defendant's conviction, I express no views on the question whether the trial court's refusal to admit the statements of Walter Barry and Mark Jackson under the hearsay exception of *Evid.R.* 63(10) was harmless error.

I would affirm the judgment of the Appellate Division.

*For reversal and reinstatement*—Chief Justice WILENTZ and Justices SULLIVAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—6.

*For affirmance*—Justice PASHMAN—1.